FILED

Oct 13 2016, 6:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas King,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 13, 2016

Court of Appeals Case No.
49A02-1510-CR-1712

Appeal from Marion Superior Court.
The Honorable Kurt M. Eisgruber,
Judge.
Cause No. 49G01-1506-MR-21083

**Barteau, Senior Judge**

## Statement of the Case

Thomas King appeals his convictions of murder, a felony,[1] and possessing a handgun without a license, a Class A misdemeanor.[2] We affirm.

## Issues

King raises four issues, which we restate as:

    I.      Whether the trial court violated King's right to a speedy trial.

    II.    Whether the trial court abused its discretion in the course of admitting evidence.

    III.   Whether the State submitted sufficient evidence to rebut King's claim of self-defense.

    IV.   Whether the sentencing order contains errors in need of correction on remand.

## Facts and Procedural History

Thomas King and Michael Mason were acquaintances and had socialized in the past. Mason's brother and King lived in the same apartment complex in Marion County. Mason had a back condition and carried prescription pain medication with him. He usually lived with his mother, but on June 12, 2015,

---

[1] Ind. Code § 35-42-1-1 (2014).

[2] Ind. Code § 35-47-2-1 (2014).

he went to stay at his brother's apartment. On the afternoon of June 13, 2015, King, Mason, and Mason's brother were seen together at King's apartment.

[4] Luis Corrales and his family lived in an apartment across the hall from King's apartment. Corrales knew King and considered him a friend. Earlier in the day on June 13, 2015, King had knocked on the door to Corrales' apartment several times and demanded money and pills. He repeatedly said people in Corrales' apartment owed him sixty dollars. King's speech was slurred and his eyes "were barely open." Tr. p. 107. Corrales felt threatened. Corrales' fiancée, Donna Greggs, perceived King to be drunk and had seen him consume a pill, Klonopin, earlier that day. To her, King appeared "angry and aggressive." *Id.* at 138.

[5] Later that day, Mason and his brother left the apartment complex to drink alcohol with friends, and then they returned. Mason was drunk. He went to King's apartment while his brother went to his own apartment to call their mother and to see his girlfriend. After finishing the call, Mason's brother walked toward the building where King lived. As he opened the door to the building, Mason's brother heard a gunshot, followed by a thud, coming from King's apartment. He ran back to his girlfriend, and they called his mother and the police.

[6] Meanwhile, Corrales was resting in his apartment when he heard a gunshot. Next, he heard a knock at his front door. Corrales opened the door and saw King standing there with a handgun tucked into his pants. Corrales recognized

the gun, having fired it before. King told Corrales that he had "just shot a man and he wanted us to say it was self defense and – and to hide the gun for him." *Id.* at 96. King elaborated that he wanted Corrales to say "the guy tried to rob him." *Id.* Corrales did not see any signs of injury on King, and King's clothes were not disheveled.

[7] Greggs and Dorothy Wininger were also at the door, standing behind Corrales. Greggs heard King say he had just shot someone in the head and wanted Corrales to hold his gun. Wininger saw the gun and also heard King ask Corrales to hold it for him. King seemed calm to Greggs and Wininger. Wininger told Corrales not to take the gun, so he closed the door. Corrales, Greggs, and Wininger heard King leave the apartment building.

[8] After King left, Corrales went into the apartment across the hall. There were no signs of a struggle. He saw what was later identified as Mason's corpse, checked for a pulse and, finding none, went back to his apartment. As he stood on his apartment's balcony, Corrales saw King returning to the building from across the street. King did not have the gun and was on the phone, talking with a 911 dispatcher. To Corrales, King appeared "calm and collected." *Id.* at 102.

[9] Meanwhile, Officer David Miedema of the Indianapolis Metropolitan Police Department (the IMPD) and several other officers were dispatched to the apartment building to investigate a reported shooting. Miedema encountered King, who was on the phone with a 911 dispatcher but hung up when he saw Miedema. King appeared "very calm, easy to understand." *Id.* at 155.

Miedema did not see any signs of injury on King, and King's clothes were not disheveled. King stated that two men had tried to rob him, so he shot one of them and the other ran off. He led the officer to his apartment and gestured inside, where Miedema saw Mason's corpse on the floor. King did not say anything, which struck Miedema as "very odd." *Id.* at 158. There were no signs of forced entry into the apartment, and inside there were no signs of a struggle.

[10] Later, Sergeant Bradley Millikan of the IMPD questioned King at the scene. When asked what happened to the gun, King stated the second assailant took the gun and fled with it. Sergeant Millikan noted King's demeanor was "eerily calm" and "almost emotionless." *Id.* at 191. After questioning King and examining the apartment where Mason's body was found, Millikan placed King under arrest.

[11] Meanwhile, officers searched King's apartment and the area around the building for the gun but did not find it. They found a spent cartridge near Mason's body. They also found a box of ammunition in the apartment, and the spent cartridge was the same brand and caliber as the ammunition contained in the box. Later, a forensic examiner investigated King's phone and found a photograph of the gun that Corrales saw King carrying after the shooting.

[12] When Mason's body arrived at the coroner's office, the staff inventoried his clothes and personal items. He did not have his pain pills. An autopsy of Mason's body revealed he died from a single gunshot wound to the head. He

had been shot in the left temple, above the ear. The bullet passed from the left to the right side of Mason's head at a downward angle. Mason was five feet, eight inches tall, and King is six foot, three inches tall. There was no stippling around the wound, which indicated that Mason had been shot by someone standing more than three feet away. In addition, Mason's body did not show any signs that he had been in a fight before his death.

[13] On June 16, 2015, the State charged King with murder, a felony, and carrying a handgun without a license, a Class A misdemeanor. The State separately alleged the misdemeanor charge should be enhanced to a Level 5 felony because King had been convicted of a felony within the past fifteen years. In addition, the State filed a habitual offender enhancement.

[14] An initial hearing was held on June 19, 2015. King requested a speedy trial pursuant to Indiana Criminal Rule 4(B). The court granted his request, scheduling trial for August 10, 2015.

[15] At a July 23, 2015 pretrial conference, the State moved to continue the trial under Indiana Criminal Rule 4(D), asserting more time was needed to gather evidence. King objected. The court declined to address the State's 4(D) motion, choosing instead to reschedule the trial from August 10, 2015 to August 31, 2015 due to calendar congestion. The State later withdrew its request for a continuance under Criminal Rule 4(D), stating that it believed it could have all of the necessary evidence by the August 31 trial date.

Trial was held on August 31 and September 1, 2015. The jury determined King was guilty of murder and carrying a handgun without a license as a misdemeanor. King waived his right to a jury trial for the felony handgun enhancement and the habitual offender enhancement. At a subsequent bench trial, the State dismissed the felony enhancement for the handgun charge, and the trial court determined King was a habitual offender. The court sentenced King to fifty-five years for murder, enhanced by ten years for the habitual offender determination. The court further sentenced King to one year on the handgun charge, to be served concurrently with the murder sentence. Finally, the court directed that King would serve the final three years of his sixty-five-year sentence on community corrections. This appeal followed.

# Discussion and Decision

## I. Speedy Trial

King claims the trial court erred by scheduling his trial beyond the deadline set forth in Indiana Criminal Rule 4(B), thereby violating his federal and state constitutional rights to a speedy trial. The State responds that the court's decision was appropriate due to calendar congestion.[3]

---

[3] The State further claims King waived his speedy trial claim by failing to move for discharge. We disagree. When a court schedules trial beyond the time limitations of Criminal Rule 4, the defendant must object at the earliest opportunity. *Hampton v. State*, 754 N.E.2d 1037, 1038 (Ind. Ct. App. 2001), *trans. denied*. In the current case, King objected twice to having the trial rescheduled beyond the deadlines of Criminal Rule 4. Tr. pp. 13, 19-20. Thus, King presented the issue to the trial court, thereby preserving the claim for appellate review.

[18] The Sixth Amendment to the United States Constitution and Article 1, section 12 of the Indiana Constitution guarantee an accused's right to a speedy trial. *Dean v. State*, 901 N.E.2d 648, 652 (Ind. Ct. App. 2009), *trans. denied*. The provisions of Indiana Criminal Rule 4 implement the defendant's speedy trial right by establishing deadlines by which trials must be held. *Id.* Subsection (B)(1) of Criminal Rule 4 provides:

> If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar. Provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as set forth in subdivision (A) of this rule. Provided further, that a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance. Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time.

[19] Thus, when a defendant files a motion for a speedy trial, the defendant must be tried within seventy days unless the defendant caused the delay or the court's calendar is congested. *Otte v. State*, 967 N.E.2d 540, 545 (Ind. Ct. App. 2012), *trans. denied*.

[20] In this case, King moved for a speedy trial on June 19, 2015. The seventieth day would have been August 28, 2015, so the court initially scheduled a jury trial for August 10, 2015. During the July 23, 2015 hearing, the court

rescheduled the trial for August 31, 2015, shortly after the seventy-day deadline set forth in Criminal Rule 4(B). The question is whether the court's delay is justifiable.

[21] Where, as here, the trial court makes a factual finding of congestion based on disputed facts, appellate review is for clear error. *Austin v. State*, 997 N.E.2d 1027, 1040 (Ind. 2013). We neither reweigh the evidence nor determine the credibility of witnesses. *Id.* Instead, we consider the probative evidence and reasonable inferences supporting the judgment. *Id.* We reverse if we are left with a definite and firm conviction that a mistake has been made. *Id.*

[22] In this case, the State requested a continuance of the trial based on Criminal Rule 4(D). That subsection allows the State to seek a continuance if it is having difficulty obtaining evidence prior to the trial date. During the July 23, 2015 pretrial hearing, the court noted that it had other speedy trial requests for the weeks of August 10 and August 17. For the week of August 24, the court told the parties, "I've got Monte (sic) Ervin set. It's a 2014 case, an old case with out-of-town witnesses that I've prioritized as No. 1 for the 24th." Tr. p. 16. As a result, the court declined to rule upon the State's request and instead cited calendar congestion for the delay, as follows:

> I'm looking at my calendar and I'm saying I am stacked chock full, and I've got other early trial requests, and I've got on the 24th a very old murder that both parties have requested a No. 1 choice that I set way out, a long time ago, on the 24th. And because of that, in reviewing my calendar, the only realistic day I can give you is the 31st.

> So I'm not really doing what you're saying. I am saying that I cannot set it within the 70, I'm setting it on the 31st due to my calendar just being stacked up so deep.

Tr. p. 19. In a docket entry dated July 23, 2015, the court stated, "Court resets Jury Trial on first available/realistic date taking Early Trial request and the courts [sic] calendar into account. Court views this as a congested date." Appellant's App. p. 12.

[23] King claims the trial court should not have given the Ervin trial priority over his trial because: (1) Ervin had not requested a speedy trial; (2) Ervin was responsible for all of the delays in that case; and (3) Ervin's case had not yet reached the one-year deadline set forth in Indiana Criminal Rule 4(C). The State does not dispute King's characterizations of Ervin's case. Even so, King's position is not supported by precedent. In *Austin v. State*, our Supreme Court noted, "Rule 4(B) does not necessarily present a bright-line approach whereby all other cases must yield to the defendant who files a speedy trial motion." 997 N.E.2d at 1040. At the same time, speedy trial motions must receive priority treatment. *Id.* at 1041. Thus, a defendant seeking a speedy trial should be given a trial setting ahead of a defendant who had not requested a Rule 4 motion "absent extenuating circumstances." *Id.* at 1040-41. Extenuating circumstances may include "major, complex trials that have long been scheduled or that pose significant extenuating circumstances to litigants and witnesses." *Clark v. State*, 659 N.E.2d 548, 552 (Ind. 1995).

[24] In this case, the trial court described the Ervin case as a murder trial, which is frequently a complex matter, and the trial date had been scheduled for quite some time. In addition, although Ervin may not have requested a speedy trial, the parties in that case had jointly requested the trial setting the court had scheduled. The Ervin case involved witnesses who were coming from out of town. Finally, accommodating the Ervin trial delayed King's trial by only a few days beyond the seventy-day deadline. Based on this evidence, we cannot conclude Rule 4(B) required the trial court to vacate the Ervin trial and schedule King's trial in its place. *See Austin*, 997 N.E.2d at 1043 (trial court did not err by refusing to schedule defendant's trial within the seventy-day limit; the trial would have been held on relatively short notice and would have been a hardship to out-of-state witnesses).

[25] King cites *Logan v. State*, 16 N.E.3d 953 (Ind. 2014), in support of his claim, but that case is distinguishable. *Logan* involved Indiana Criminal Rule 4(C), a different subsection of the rule than the one at issue here. Furthermore, the discussion in *Logan* does not support King's claim. In *Logan*, our Supreme Court expressly declined to hold that "a trial court must always prioritize a Rule 4(B) deadline over a Rule 4(C) deadline should the two conflict" or that a "trial court must only prioritize a Rule 4(B) case when a Rule 4(C) deadline is not imminent." *Id.* at 960. Instead, the *Logan* court reaffirmed the holding in *Austin* that a trial court "may" have to reschedule other cases' trial dates to accommodate a Rule 4(B) speedy trial request. *Id.* We are not left with a

definite and firm conviction that a mistake has been made, and as a result we decline to reverse the trial court on this issue.

## II. Admission of Evidence

[26] King argues the trial court should not have admitted portions of testimony by Corrales and a police officer, claiming their testimony was hearsay and amounted to improper vouching testimony. The State claims the testimony was necessary and appropriate to respond to King's attempts to impeach Corrales by challenging his honesty.

[27] We review the admission of evidence only for an abuse of discretion. *Kyle v. State*, 54 N.E.3d 439, 443 (Ind. Ct. App. 2016). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effects of the facts and circumstances before it. *Id.*

[28] In general, hearsay evidence is not admissible. Ind. Evid. Rule 802. Hearsay is an out of court statement offered in evidence "to prove the truth of the matter asserted in the statement." Ind. Evid. Rule 801(c). A statement by a witness is not hearsay if: (1) the declarant testifies; (2) the declarant is subject to cross-examination about a prior statement; (3) the prior statement is consistent with the declarant's testimony; and (4) the prior statement is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying. Ind. Evid. Rule 801(d)(1).

[29] In this case, on direct examination Corrales testified that King had told him that he was going to claim self-defense and asked Corrales to support his story. On cross-examination, Corrales conceded that when he first gave a statement to the police on the day of the murder, he may not have told them that after the shooting, King told him he was going to say he shot Mason in self-defense. Corrales also testified on cross-examination that he had to move out of the apartment after the incident and was homeless for a period of time. He stated that at the time of trial, he was staying in a hotel room for which the State was paying.

[30] Later during the State's case-in-chief, the prosecutor recalled Corrales to the stand. Corrales testified that after the police arrived at the scene, he told an officer that King had said he was going to claim self-defense. Next, the State called Officer Richard Lavish, Jr., of the IMPD to the stand. Lavish testified that he spoke with Corrales after the shooting. Corrales told Lavish that King came to his door, asked him to take his gun, and to tell the police it was self-defense.

[31] King argues the later testimony from Corrales and Lavish was inadmissible hearsay. We disagree because the testimony meets the definition of a prior consistent statement under Evidence Rule 801(d)(1), and the State properly used it to rehabilitate Corrales on redirect examination. Corrales and Lavish testified about a prior statement (that Corrales had said King told him he would claim self-defense). Corrales and Lavish were subject to cross-examination about the statement. In addition, their testimony on redirect was consistent

with Corrales' initial testimony on direct examination that King told him he intended to claim self-defense. Finally, the State offered Corrales' and Lavish's testimony to rebut King's allegation that the State improperly influenced Corrales' testimony by paying for his hotel room. Their testimony was not hearsay. *See Bassett v. State*, 895 N.E.2d 1201, 1213-14 (Ind. 2008) (witness's prior consistent statement was admissible to rehabilitate her testimony after the defendant alleged on cross-examination that she had fabricated her testimony on direct examination); *Moreland v. State*, 701 N.E.2d 288, 293 (Ind. Ct. App. 1998) (police officer allowed to testify about what victim had told her earlier; officer's testimony was a prior consistent statement and thus not hearsay).

[32] King claims that Corrales and Lavish's testimony amounted to inappropriate vouching for Corrales' truthfulness on direct examination. We disagree. Neither lay nor expert witnesses are competent to testify that another witness is or is not telling the truth. *Nordstrom v. State*, 627 N.E.2d 1380, 1384 (Ind. Ct. App. 1994), *trans. denied*. In this case, neither Corrales nor Lavish testified as to Corrales' truthfulness. Instead, they simply reported the prior statements. The trial court did not abuse its discretion in admitting their testimony. *See id.* (officer did not present improper vouching testimony when he discussed statements he had made to defendant during the investigation).

## III. Self-Defense

[33] King asserts the State failed to present sufficient evidence to disprove his claim of self-defense. When a claim of self-defense is raised and finds support in the

evidence, the State has the burden of negating at least one of the necessary elements. *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002). The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999).

[34] The standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wilson*, 770 N.E.2d at 801. We do not reweigh the evidence or judge the credibility of the witnesses. *Id.* We consider only the probative evidence and reasonable inferences drawn from the evidence that support the verdict. *Miller*, 720 N.E. 2d at 699. If the defendant is convicted despite a claim of self-defense, this Court will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Wilson*, 770 N.E.2d at 800-01.

[35] "A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2(c) (2013). "No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary." *Id.* To prevail on a claim of self-defense under Indiana Code section 35-41-3-2, a defendant must have: (1) acted without fault; (2) been in a place where he or she had a right to be; and (3) been in reasonable fear or apprehension of bodily

harm. *Weedman v. State*, 21 N.E.3d 873, 891-92 (Ind. Ct. App. 2014), *trans. denied*.

[36] At trial, King claimed he should not be held responsible for murder and carrying a handgun without a license because he shot Mason in self-defense when Mason and another person attempted to rob him in his apartment. The State presented sufficient evidence to rebut King's claim. King's apartment showed no signs of a struggle or forced entry. In addition, King's clothing was not disheveled after the incident, and he was perfectly calm. Mason's corpse showed no signs of a fight. To the contrary, the autopsy showed Mason was drunk and had been shot in the head from more than three feet away, which undermines King's claim of a fight.

[37] Immediately after the shooting, Corrales and one of his roommates saw King carrying a gun. King said he shot someone, was going to claim self-defense, and asked Corrales to substantiate his claim and hide the gun. When Corrales declined, King left the apartment building but returned soon thereafter, without the gun. This evidence contradicts King's statement to the police that a second assailant took the gun as he fled from King's apartment. Corrales did not hear anyone fleeing from King's apartment after the gunshot.

[38] In addition, earlier in the day King appeared to witnesses to be high on alcohol and drugs, and he had demanded money or pills from Corrales' roommates. Mason always carried pain medication with him, but after the murder the pills were not found on Mason's body. This is ample evidence from which a

reasonable finder of fact could have concluded that King murdered a highly intoxicated Mason to take his pills and thus failed to act without fault. *See McCullough v. State*, 985 N.E.2d 1135, 1139 (Ind. Ct. App. 2013) (State submitted sufficient evidence to rebut claim of self-defense where evidence from the victim's bodies undercut defendant's claim of a struggle and the defendant attempted to conceal evidence), *trans. denied*.

## IV. Sentencing

[39] King claims the sentencing order is "confusing" and should be clarified. First, he notes the sentencing order states the habitual offender enhancement is "merged" with the murder conviction, which he claims is inappropriate terminology. Appellant's App. p. 21. We note the order also states the murder sentence was "enhanced 10 years by habitual offender enhancement." *Id.* at 22. Reading the order as a whole, we cannot conclude a reasonable person would be confused as to the relationship between the murder sentence and the habitual offender enhancement.

[40] Next, King claims the trial court failed to state with sufficient clarity that he is serving the final three years of his sentence on community corrections. We disagree. Page two of the sentencing order clearly states King will serve "62 years DOC followed by 3 years of community corrections." *Id.* The order sufficiently explains the sentence, and we do not see a need for remand.

## Conclusion

[41] For the reasons stated above, we affirm the judgment of the trial court.

[42]    Affirmed.

May, J., and Pyle, J., concur.